IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CARGO-LEVANT SCHIFFAHRTSGESELLSCHAFT MBH | : : : : |
| Plaintiff | : : |
| vs. | : : | Civil Action No. |
| PSL LIMITED | : : |
| Defendant | : : |
| and | : : |
| PSL NORTH AMERICA, LLC | : : |
| Garnishee | : |

## **VERIFIED COMPLAINT IN ADMIRALTY**

Cargo-Levant Schiffahrtsgesellschaft MbH ("Cargo Levant"), by and through its undersigned counsel files this Verified Complaint in Admiralty against Defendant PSL Limited and alleges, upon information and belief, as follows:

### **JURISDICTION**

1.     This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C.

PBH405411.1

§1333.   Jurisdiction also exists under 9 U.S.C. § 203, as this action is brought in aid of recognition and enforcement of a foreign arbitral award.

## THE PARTIES

2.      At all material times Plaintiff Cargo Levant was and is a company organized and existing under the laws of the Republic of Germany, with a principal place of business at Domshof 18-20, 28195 Bremen, Germany, and was and is engaged in the business of the carriage of merchandise by sea for hire.

3.      At all material times Defendant PSL Limited was and is a company organized and existing under the laws of India, with a principal place of business in Mumbai, India.

4.      Garnishee PSL North America, LLC is a corporation organized and existing under the laws of the state of Delaware, with a registered agent located at Corporation Trust, Co., 1209 Orange St., Wilmington, DE 19801. At all material times, PSL North America LLC maintained a bank account at Wells Fargo Bank N.A. located at 171 17th Street, NW, Atlanta, Georgia 30363.

## THE UNDERLYING DISPUTE AND ARBITRATION AWARD

5.      At all times material hereto Plaintiff Cargo Levant was the disponent owner of the ocean-going cargo vessel M/V SUNRISE.

6.      Plaintiff Cargo Levant and Defendant PSL Limited entered into a Liner Booking Note ("Booking Note") dated June 26, 2009, whereby Defendant

2

PSL Limited contracted with the Plaintiff for the carriage of a cargo of steel pipes from Mundra, India, to either Algiers or Skikda, at Defendant's option, aboard the M/V SUNRISE. (A copy of the Liner Booking Note, including the arbitration agreement is attached as Exhibit A).

7.     A dispute arose between Cargo Levant and PSL Limited when the shipment of the cargo contemplated by the Booking Note did not take place as agreed.

8.     Clause 22 of the Booking Note provided that all disputes between the parties were to be arbitrated in London, England, with English law to apply.

9.     Plaintiff Cargo Levant commenced an arbitration proceeding in London against Defendant PSL Limited seeking payment of the amounts due to Cargo Levant under the Booking Note.

11.     An arbitration hearing was held in London on March 12, 2012, before the appointed sole arbitrator, David Farrington, at which time Cargo Levant and PSL Limited appeared and presented their respective cases.

12     The arbitrator David Farrington issued his Final Arbitration Award on April 30, 2012, finding in favor of Cargo Levant, and awarding Cargo Levant (a) the principal sum of $421,031.90, plus interest at the rate of 5.50% compounded every three months from September 1, 2009 through the date of payment (calculated to be $516,747.06 as of June 1, 2013), (b) the Plaintiff's share of the

PBH405411.1

arbitrator's fees in the amount of $8,419.95, plus interest thereon at the rate of 5.5% compounded every three months from the date of payment by the Plaintiff to the date of reimbursement by the Defendant (calculated to be $10,334.10 as of June 1, 2013), (c) costs incurred by the Plaintiff in connection with the arbitration of £89,390.46 ($137,661.31 at today's exchange rate of $1.54 per British pound) plus interest thereon at the rate of 5.5% compounded every three months from April 30, 2012, to the date of payment (calculated to be $145,390.28 as of June 1, 2013). (A copy of the arbitration award is attached as Exhibit B).

On December 21, 2012, the arbitrator David Farrington issued his costs award finding in favor of Cargo Levant and awarding Cargo Levant (a) costs incurred in connection with obtaining the Costs award of £3,522.50 ($5,424.65 at today's exchange rate of $1.54 per British pound) plus interest thereon at the rate of 5.5% compounded every three months from December 21, 2012, to the date of payment (calculated to be $5,549.53.85 as of June 1, 2013), and (b) the Arbitrator's fees for the Costs Award of £2000 ($3,080 at today's exchange rate of $1.54 per British pound) plus interest thereon at the rate of 5.5% compounded every three months from December 21, 2012, to the date of payment (calculated to be $3,150.91 as of June 1, 2013). (A copy of the arbitrator's costs award is attached as Exhibit C).

PBH405411.1

13.    The Final Arbitration Award in favor of Cargo Levant remains unpaid despite due demands made by Cargo Levant to Defendant PSL Limited.

## DEFENDANT NOT FOUND WITHIN THIS DISTRICT

14.    Defendant PSL Limited cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Admiralty Rules"). (See supporting Affidavit of Kevin G. O'Donovan, Esq., attached hereto as Exhibit D).

15.    Upon information and belief, Defendant now has, or during the pendency of this action will have, property, goods, chattels, or credits and effects present within this District and Plaintiff is entitled to attach Defendant's property within the District pursuant to Supplemental Admiralty Rule B.

16.    Upon information and belief, the named PSL North America LLC now has, or during the pendency of this action will have within their custody or possession and/or under their control within this District, certain tangible or intangible goods, chattels, credits, freights, effects, debts, obligations, assets and/or funds belonging to, owed to, claimed by or being held for Defendant PSL Limited, including, but not limited to, funds or other assets maintained in a bank account at Wells Fargo Bank N.A. located at 171 17th Street, NW, Atlanta, Georgia 30363.

PBH405411.1

17.    Cargo Levant seeks an Order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Admiralty Rule B and also pursuant to the United States Arbitration Act, 9 U.S.C. § 1 and 8, attaching, inter alia, any property of PSL Limited held by PSL North America LLC or otherwise present in this District for the purpose of obtaining personal jurisdiction over PSL Limited, and to secure Cargo Levant's claims as described above.

WHEREFORE, Cargo Levant prays:

A.    That process in due form of law according to the practice of this Honorable Court in causes of admiralty and maritime jurisdiction may issue against Defendant, PSL Limited,  Inc., and that such Defendant be personally cited to appear and answer the matters aforesaid;

B.    That Process of attachment and garnishment be issued and served pursuant to Supplemental Admiralty Rules B(1) and E against the name Garnishee, PSL North America, LLC to attach all goods, chattels, debts, credits, freights, property, monies, funds and/or other effects, tangible or intangible, belonging to, owed to, claimed by or being held for or on behalf of Defendant PSL Limited to secure Cargo Levant's claims up to the amount of  $681,171.88, plus interest at the rate of 5.50% compounded every three months from June 1, 2013 to the date of reimbursement by the Defendant directing said Garnishees to retain any and all

such tangible or intangible property intact within this District pending the further Order of this Court and citing said Garnishees to appear and answer under oath the matters aforesaid as required by Supplemental Admiralty Rule B(3)(a); and

    C.    That since PSL Limited cannot be found within this District within the meaning of Supplemental Admiralty Rule B, that the Clerk be directed to issue supplemental Process of Maritime Attachment and Garnishment to attach any and all additional goods, chattels, debts, credits, freights, property, monies, funds and/or other effects, tangible or intangible, belonging to, owed to, claimed by or being held for or on behalf of Defendant which may be found within the jurisdiction of this Court to secure Cargo Levant's claims up to the amount of principal sum of $681,171.88, plus interest at the rate of 5.50% compounded every three months from June 1, 2013 to the date of reimbursement by the Defendant, and that all persons claiming any interest in said property be cited to appear, and pursuant to Supplemental Admiralty Rule B, answer the matters alleged in the Complaint; and

    D.    That this Honorable Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be commenced in the future, including any appeals thereof; and

PBH405411.1

E.      That Cargo Levant be awarded such other, further and different relief as the Court may deem just and proper.

The undersigned certifies that this document was prepared using Times New Roman 14 point font.

This 10th day of July, 2013.

THE SPEARS & ROBL LAW FIRM, LLC

By:   /s/ Robert E. Spears. Jr.
          Robert E. Spears, Jr.
          Georgia Bar No. 670195
          Attorneys for Plaintiff Cargo Levant
          Schiffahrtsgesellschaft MbH

104 Cambridge Avenue
Decatur, Georgia, 30030
(404) 373 5150
respears@tsrlaw.com

PBH405411.1

EXHIBIT A



2

### ANNEXURE TO BOOKING NOTE DATED 26TH JUNE 2009

14. MERCHANTS TO PROVIDE CARGO / CARGO DOCUMENTS READY FOR LOADING PRIOR VESSEL'S ARRIVAL AT MUNDRA, ANY DELAYS CAUSED FOR BERTHING DUE TO THE ABOVE, TO BE COUNTED AS DETENTION. DETENTION IF ANY, AT LOAD PORT TO BE PAYABLE ALONGIWTH THE FREIGHT.

15. RECEIVERS TO ARRANGE FOR CUSTOM READINESS AND DIRECT DELIVERY UNDER HOOK AT ALGERIA PRIOR TO VESSEL'S ARRIVAL. ANY DELAYS FOR BERTHING TO BE TREATED AS DETENTION. MERCHANTS TO BE RESPONSIBLE FOR PAYMENT OF DETENTION IF ANY AT DISCHARGE PORT WITHIN 10 DAYS OF SUBMISSION OF DOCUMENTS / SOF. E-MAIL / FAX COPIES TO BE TREATED AS ORIGINALS.

16. FREIGHT FULLY PREPAID TO OWNERS NOMINATED BANK UPON COMPLETION OF LOADING & PRIOR SIGNING / RELEASING BILLS OF LADING.

17. LINER TERMS AS FAST AS VESSEL CAN LOAD / DISCHARGE

18. NO OTHER CARGO TO BE STOWED ON TOP OF PIPES .

19. OWNERS AGENTS BOTH ENDS

20. VESSEL DETAILS : AS ATTACHED

21. CARRIERS TO DECLARE FINAL NOMINATION WITHIN 7 DAYS COMMENCEMENT OF LAYCAN. MERCHANTS TO DECLARE DISCHARGE PORT WITHIN VESSEL'S PASSING SUEZ CANAL.

22. ARBITRATION IF ANY IN LONDON, ENGLISH LAWS TO APPLY.

FOR SAI SHIPPING CO (P) LTD., MUMBAI         FOR PSL LTD., GANDHIDHAM

AS AGENTS ONLY
FOR & ON BEHALF OF CARRIERS
----------------------------         AS MERCHANT / CHARTERERS



ANNEXURE TO : BOOKING NOTE - DATED 26TH JUNE 2009

13. MERCHANTS TO PROVIDE CARGO / CARGO DOCUMENTS READY FOR
LOADING PRIOR VESSEL'S ARRIVAL AT MUNDRA, ANY DELAYS CAUSED
FOR BERTHING DUE TO THE ABOVE TO BE COUNTED AS DETENTION.
DETENTION IF ANY AT LOAD PORT TO BE PAYABLE ALONGWITH THE
FREIGHT.

14. RECEIVERS TO ARRANGE FOR CUSTOM READINESS AND DIRECT DELIVERY
UNDER HOOK AT ALGERIA PRIOR TO VESSEL'S ARRIVAL, ANY DELAYS FOR
BERTHING DUE TO ABOVE TO BE TREATED AS DETENTION. MERCHANTS TO
BE RESPONSIBLE FOR PAYMENT OF DETENTION IF ANY AT DISCHARGE PORT
WITHIN 10 DAYS OF SUBMISSION OF DOCUMENTS - SOF, E-MAIL / FAX COPIES
TO BE TREATED AS ORIGINALS.

15. FREIGHT FULLY PREPAID TO OWNERS NOMINATED BANK UPON COMPLETION
OF LOADING & PRIOR SIGNING / RELEASING BILLS OF LADING.

16. LINER TERMS AS FAST AS VESSEL CAN LOAD / DISCHARGE

17. NO OTHER CARGO TO BE STOWED ON TOP OF PIPES.

18. OWNERS AGENTS BOTH ENDS

19. VESSEL DETAILS : AS ATTACHED

20. CARRIERS TO DECLARE FINAL NOMINATION WITHIN 7 DAYS
COMMENCEMENT OF LAYCAN. MERCHANTS TO DECLARE DISCHARGE PORT
WITHIN VESSEL IS PASSING SUEZ CANAL.

21. ARBITRATION IF ANY IN LONDON. ENGLISH LAWS TO APPLY.

FOR S.J. SHIPPING CO.(P) LTD. MUMBAI          FOR PSL LTD. GANDHIDHAM

AS AGENTS ONLY
FOR & ON BEHALF OF CARRIERS                    AS MERCHANT / CHARTERERS

EXHIBIT B

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:


CARGO LEVANT SCHIFFAHRTSGESELLSCHAFT MBH

Claimants (Carrier)


and


PSL LIMITED

Respondents (Merchant)


m/v "Sunrise"


Liner Booking Note dated 26th June 2009


FINAL AWARD


1. This Award is made in a reference which involves a claim by Cargo Levant Schiffahrtsgesellschaft of Germany ("the Claimants") as carriers against PSL Limited of Gandhidham, Gujarat, ("the Respondents") as merchants under a liner booking note on the Conlinebooking form dated 26th June 2009 with additional clauses ("booking note"). The booking note was amended on 30th June and 7th July in circumstances which are discussed later in this Award.

2. The booking note provided in clause 22 that arbitration was to be in London and that English law was to apply. The parties appointed as Sole Arbitrator me, David Farrington, of Chorley Farm House, West Wycombe, Buckinghamshire

HP14 4BS. I thereupon entered into the reference. The seat of this arbitration is England. The parties exchanged the usual formal submissions. On 12th March 2012 there was a hearing in London at which live testimony via telelink from India was heard from a witness, Mr Mann, and oral closing submissions were made. The Claimants were represented by Mr Christopher Smith and the Respondents by Mr Yash Kulkarni, both of counsel.

3. In brief the booking note provided that the Claimants' vessel "Sunrise" ("the vessel") was to proceed to Mundra on the west coast of India and there load a part cargo of 5,152 pipes totalling 7,810 tonnes gross (2% more or less in carrier's option) for carriage to and discharge at Algiers or Skikda in the Respondents' option ("the cargo"). The freight rate was US$67.50 per tonne. In the event the cargo was not loaded. The Claimants sought deadfreight and/or damages of US$421,031.90 (initially US$527,204.16) plus interest and costs. They alleged that the Respondents were in repudiatory breach of contract. The Respondents denied liability. They put in issue the terms of the booking note. They also alleged that the Claimants had affirmed the contract, consequent upon the Respondents' failure to load within a specified period, but that the Claimants had then subsequently failed to present the vessel for loading.

4. The first decision which has to be made concerns the terms of the booking note. In order to make that decision it is necessary to reach a conclusion on which broker was acting for which party during the negotiations. The direct negotiations took place between Sai Shipping Co (P) Ltd – who it was agreed were the agents or brokers of the Claimants ("Sai Shipping") – and Aditya Marine Limited ("Aditya Marine"). The Claimants said that Aditya Marine were the agents or brokers of the Respondents. However, although the Respondents accepted that for the performance of the contract Aditya Marine were their representatives, the Respondents said that for the purpose of the negotiations Aditya Marine were not their agents or brokers; they acted either on behalf of the Claimants or as middle brokers because Aditya Marine did not have any actual

authority (whether express or implied) or ostensible authority to act on behalf of or bind the Respondents.

5. The background was that the Respondents had a contract dated 30th July 2008 with Fusion Provida for the sale of two shipments of steel pipes to Fusion Provida or their nominee. The contract provided, amongst other things, for the Respondents to procure and pay for the carriage of the pipes to four named ports in Algeria. The preferred carrier was CNAN who, it appears, were unable on this occasion to perform. By a letter dated 26th June 2009 the Respondents appointed Aditya Marine to undertake certain tasks in connection with the cargo including "arrangement of suitable vessel". The "Sunrise" was named as the proposed vessel. The letter provided for laycan to be 21st July – 31st July 2009 "subject to charterer option" and stated that the freight rate was subject to Aditya Marine bearing all costs related to the vessel. The oral evidence of Mr Mann, who at the material time was the Respondents' General Manager, was that he had put the business out into the market and that as a result Mr Nair – a Director of Aditya Marine – had approached the Respondents. In a written statement Mr Nair said that he had been approached by Sai Shipping to find a cargo for the vessel, an assertion denied by Mr Subramaniam the General Manger of Sai Shipping. Neither Mr Nair nor Mr Subramaniam gave oral evidence.

6. In an e-mail dated 25th June to the Respondents Mr Nair stated that he had taken the matter up with "Owners to renegotiate the ocean freight". Certain figures were given for the Claimants' freight proposals and the message asked for a prompt response. Mr Mann's evidence was that Aditya Marine were negotiating on behalf of the Claimants. Although it was not stated in terms by Mr Mann, it was implicit from his answer that the Respondents were negotiating in their own right and without brokers acting on their behalf.

7. I accept Mr Mann's evidence that the Respondents put the business out into the market and that they were approached by Aditya Marine. I am unable, however, to accept Mr Nair's evidence that he had been approached by Sai Shipping. There was no contemporaneous document in support of the assertion and in the

commercial context it is unlikely that Sai Shipping for the purpose of finding a
fixture for the vessel would have approached an organisation which in Mr Nair's
own words was then principally concerned with "port and cargo handling
operations (as opposed to vessel fixtures)". The commercial thrust of the letter
dated 26th June was that the Respondents appointed Aditya Marine as their
representatives to find a vessel ("arrangement of a suitable vessel") and to
organise the shipment and carriage of the cargo at the cost specified in the letter.
That appointment and the matters to be organised were consistent with the
Respondents' obligations under their contract with Fusion Provida. In short the
letter date 26th June was a contract between the Respondents and Aditya Marine,
a position which Mr Mann confirmed in his oral evidence.

8.  Further, the message of 25th June where it mentions "strongly" taking up with
owners the issue of a freight rate is not consistent with the role of either a middle
broker – who would normally pass messages on a "quote" end "quote" basis – or
a broker who is, as Mr Kulkarni put it, on the Claimants' side of the line. The
Claimants' broker was unlikely to tell a potential charterer that he had addressed
his principal "strongly". I am also not satisfied with the suggestion whereby
Aditya Marine can be said to be the Claimants' brokers or agent for the purpose
of negotiating the contract of carriage but are also said to be the Respondents'
agent or broker for purpose connected with the execution of that contract – in
my experience an extremely unusual if not unique suggestion.

9.  I find, therefore, that in the negotiations concerning the terms of the booking
note Aditya Marine were acting for and on behalf of the Respondents. The letter
dated 26th June gave them express authority. I also find that they were not
middle brokers nor acting on behalf of the Claimants. These findings can be
tested in two ways. First, by reference to Aditya Marine's message of 31st July to
the Respondents where Mr Nair talks of a message received from owners
through their agents. Had Aditya Marine been acting as agents or brokers for the
Claimants, then it is more likely they would have referred to their principals.
Second, by reference to a message sent by Mr Nair on 12th August when he
recorded surprise on behalf of his principals (whom he did not name) that the

cargo was being circulated in the market -- in context the "principals" could only have been the Respondents who of course had their obligations to Fusion Provida to supply the cargo.

10. The booking note was signed by both parties. The starting point, therefore, is that it contains the agreement between the parties, subject to the amendments made on 30th June in relation to clause 13 and on 7th July in relation to the postponement of laycan. I do not consider the absence of an entire agreement clause to be material: such a clause is rarely included in a voyage charter which, in effect, is the basis of the booking note.

11. However, said the Respondents, the booking note contained two express and/or implied terms which were set out in paragraph 9(b) of the defence submissions dated 7th July 2011. They said that the letter of 26th June had been incorporated. Further, that in a telephone conversation on 27th June between Mr Mann and Mr Nair they agreed the amendment or cancellation of laycan upon 15 days' advance notice by the Respondents; the conversation was reported in an e-mail dated 27th June from Mr Mann to Mr Nair. These are important points. However, no disrespect is intended to the Respondents when I say that I am able to deal quickly with them. The letter and the conversation were between the Respondents and Aditya, whom I have found to have been the Respondents' agents or brokers. There was no evidence that the contents of either the letter or of the conversation were passed to Sai Shipping or that that company on behalf of the Claimants agreed to the two terms. I find, therefore, that even if there was agreement between the Respondents and Aditya Marine, the Claimants were not aware of that agreement and did not agree that the terms be incorporated into the booking note. Further, I observe in passing that neither the letter nor the e-mail mentioned the cancellation of laycan upon 15 days' advance notice.

12. Nor is there any need to imply the two terms into the booking note to make it commercially effective. To the contrary, if the two terms were to be implied they would substantially change the nature of the customary arrangements between an owner and a charterer under a voyage charter because the effect would be that

an owner would be under an obligation to present the vessel but that the date of presentation would exclusively be in the hands of the charterer. In short, a recipe for chaos when one of the purposes of a laycan spread is to introduce certainty of dates for both parties.

13. The conclusion which I have reached, therefore, is that the booking note was not amended either expressly or by implication to include the terms set out in paragraph 9(b) of the defence submissions. The conclusion is supported by the fact that on 4th July Mr Mann in an e-mail requested an extension of the agreed laytime of 21st – 31st July to 1st – 11th August. This was passed by Aditya Marine to Sai Shipping who passed it to the Claimants. It is clear from the e-mail of 4th July that it was a request (Mr Mann actually used that word) and not the exercise of an existing contractual right. It led to a further version of the booking note being signed by both parties, an event which would not have been necessary if there had been a contractual right to an extension.

14. Laycan was, therefore, amended to 1st – 11th August. On 18th July the Respondents asked for a postponement until 21st – 31st August or, alternatively, cancellation of the shipment. The message concluded by confirming the cancellation. On 20th July the Respondents asked that the shipment be treated as cancelled. Mr Kulkarni accepted that both messages were anticipatory breaches of contract. The principal difference between the parties was that the Claimants said that the repudiation was accepted whereas the Respondents alleged that on each occasion the Claimants had affirmed the contract and were insisting on performance. Mr Kulkarni relied in particular on two messages dated 18th and 20th July which stated that the vessel was maintaining her schedule in accordance with the booking note. In these circumstances it is not necessary for me to make a decision about the Respondents' message of 17th July which the Claimants also maintained was a clear repudiation.

15. On 24th July Aditya Marine repeated the message of 20th July which they described as "very clear". The response of the same day from Sai Shipping was

that they looked forward "to some positive response/confirmation soon". Mr. Kulkarni accepted that was not an affirmation. On 28th July notification was given on behalf of the Claimants that the vessel's eta Mundra was 3rd/4th August; the message requested that the cargo be ready for loading prior to the vessel berthing. Later that same day Aditya Marine sent to Sai Shipping a message; it referred to the message of 24th July, and continued by saying that the shipment would be effected but that it would not be on the "Sunrise". On 31st July the Claimants advised that the vessel was sailing from Bandar Immam Khomeini and gave an eta Mundra on 4th August.

16. However, on 1st August Sai Shipping sent a message to Aditya Marine that the Claimants would hold the Respondents liable if the cargo was not loaded on the vessel. The reply from Aditya Marine was in conciliatory terms and it explained the reasons why the cargo could not be shipped at that time. The Claimants held some internal discussions (as was to be expected) about what they should do.

17. On 4th August the Claimants concluded a fixture with Transammonia AG for one time charter trip via Oman with a duration of about 12 days ("the Transammonia fixture"). On or about 7th August there was a conversation between Mr Vohra of Sai Shipping and the Chairman of the Respondents; it appears that they discussed when the Respondents might have the cargo available for shipment.

18. On 13th August Sai Shipping sent to Aditya Marine a message which contained the following passage:

"...owners are still awaiting the final decision as to how PSL would handle the charter party terms and committed cargo for our vessel, as advised earlier owners have been patient and changed laycan as well as now awaited for shippers to get approvals but regrettably nothing is forthcoming on a firm committed basis. ... owners hereby wish to notify charterers that in reference to the charter party terms vessel will be available to charterers for 20/25 august 09 at mundra as per terms and conditions of c/p and owners seek charterers firm

*commitment by 1800 hrs today german time failing which the vessel be employed for alternate employment to mitigate owners losses and all differences will be claimed from PSL."*

19. On 19th August the message set out in the preceding paragraph was repeated, save that the vessel was indicated as being ready to load at Mundra on 21st August and that a response was expected by 20th August 11.00 German time. On 21st August the Claimants ordered the vessel to proceed towards South Africa to look for alternative business. As events transpired the vessel did not fix an alternative cargo and she sailed in ballast to Europe. On 28th August Mr Mann replied directly to Sai Shipping and said that the shipment should be treated as cancelled for the time being.

20. Mr Kulkarni submitted that the Claimants' decision to accept the repudiatory breach had to be clear and unequivocal; they had to treat the contract as at an end. He took me to Lord Blackburn's words in Scarf v Jardine (1882) 7 App. Cas. 345 from the foot of page 360 to the top of page 361. Mr Kulkarni accepted that a decision could be communicated by words or conduct and he said that the decision once made was final and binding: see The Kanchenjunga [1990] 1 Lloyd's Rep. 391 at page 398. The innocent party had to make it plain that the treated the contract as at an end – see Hayman v Dawkins [1942] AC 356 at page 361 – and that by keeping silent or by doing nothing an innocent party could not be communicating its acceptance of a breach: see STC v Golodetz [198] 2 Lloyd's Rep. 277 at page 286 rhc. The issue was fact sensitive in the light of the language used and the surrounding circumstances. He took me to the Commercial Court decision in The Santa Clara [1993] 2 Lloyd's Rep. 301 at page 304 rhc, and also to the decision of the House of Lords at [1996] 2 Lloyd's Rep. 225 at page 230 rhc where Lord Steyn mentioned the view of the ordinary businessman. The effect of an affirmation was that it kept the contract alive.

21. In broad terms Mr Smith accepted these propositions, although his view – which I share – was that the effect of some of Kerr LJ's judgment in Golodetz

had been limited by the House of Lords at page 230 rhs in The Santa Clara. However, Mr Smith placed emphasis on the words of Lord Steyn in the same passage that in the practical world of businessmen an omission to act may be as pregnant with meaning as a positive declaration. He said that it was clear from Yukon Line v Rendsburg Investments [1996] 2 Lloyd's Rep. 604 that a request by the innocent party that the other reconsiders its position did not amount to an affirmation. All the passages to which I was referred by counsel are well known and I have, therefore, resisted the temptation to quote them verbatim.

22. As mentioned in paragraph 14 above Mr Kulkarni accepted that the messages dated 18th and 20th July were anticipatory breaches by the Respondents. Mr Smith accepted that if taken in isolation Sai Shipping's message of 28th July (which advised that the vessel would be ready to load at Mundra on 3rd/4[th] August in accordance with the terms of the booking note) could be considered to be an affirmation but he submitted that it was in reality no more than a reference to the Respondents' offer on 20th July to perform the shipment as and when the cargo was available. I am unable to agree. The message is clear. The vessel was en route to the loading port in accordance with the booking note and the Respondents were required to have the cargo ready with appropriate clearances. The whole tenor of the message is at variance with an acceptance of a breach. To the contrary it was, and I so find, an affirmation of the contract.

23. However, the Respondents replied almost immediately on 28th July by referring to their message of 24th July in which they sought confirmation concerning their message of 20th July that the shipment was cancelled. So, in plain words, the Respondents were confirming their previously stated position that they did not want the vessel. The reply by Sai Shipping on 31st July referred to the shipment as having been "arbitrarily cancelled" and that the vessel was "now without employment". The message gave an eta Mundra and asked what could be done.

24. Mr Kulkarni submitted that the fact that the vessel was proceeding to Mundra showed that the contract was again being affirmed. I am unable to agree with his submission. The message merely gave an eta Mundra but no other specifics

which perhaps was not surprising: the port of Bandar Immam Khomeini was not one at which cargoes are readily available so there was little to be gained by the vessel remaining there. Further, the language used in the message is almost that of despair, which was perhaps hardly surprising in the circumstances. The earlier affirmation on 28th July had been rejected almost immediately by the Respondents who referred to the earlier message of 24th July; in short, the Respondents were saying, the shipment was cancelled from their perspective and they wasted no time in making that plain. Sai Shipping's message accurately recorded the then position and, almost as a cri de coeur, asked what could be done. I consider that to be akin to the position in Yukon Line and therefore it was no more than a request to the party in breach to reconsider. I further find that an ordinary businessman in the position of the Respondents would have understood the message to mean that the Claimants believed the contract to be at an end, and that they had at their disposal a vessel which was available for loading a substantial amount of cargo. The message is capable of no other sensible construction in the relevant circumstances. I regret to say that I found the evidence of Mr Mann (an experienced businessman with a more than reasonable command of the English language, despite his modesty in that regard) on this topic to be unhelpful and at odds with the contemporaneous documents.

25. Although it is not necessary to do so, for the sake of completeness I ought to deal with Mr Smith's submission that (a) by concluding the Transammonia fixture on 4th August and (b) by informing the Respondents of that fixture on 7th and 13th August the Claimants' actions were sufficient to amount to an acceptance of the Respondents' repudiation. This was on the grounds that the vessel could not perform both the Transammonia fixture and meet the laycan under the booking note. It may well be that in an ideal world where everyone has the requirements of the common law of repudiation at their fingertips or lawyers readily to hand, a formal message concerning the Transammonia fixture would have been sent. However, things are somewhat different in the real world. I consider it likely that in the conversation on 7th August between the Chairman of

the Respondents and Mr Vohra of Sai Shipping there was mentioned not only the repudiation but also the mitigation voyage. Mr Mann's written statement – where he said that the Claimants realised that it was pointless to hold the Respondents to the shipment dates and they decided to fix the voyage with Transammonia – supports that conclusion. So there was communication of the fact, a position reinforced by Sai Shipping's message of 13th August. That message was not, despite Mr Kulkarni's submission, a threat to accept a repudiatory breach. It recorded that the vessel had performed the Transammonia fixture and – harking back to the cri de coeur – indicated that shipment could still be effected on the same terms and conditions but with a different laycan. It should be borne in mind that the vessel was open in a difficult market generally and in an area where cargoes were not plentiful. It was hardly surprising that the Claimants made the enquiry.

26. Although quantum was formally in issue including an allegation in the rejoinder submissions that the Claimants did not properly mitigate their losses because of an alleged delay between 20th July and 4th August, there was no argument at the hearing. Accordingly, on the evidence I find that having regard to both the prevailing market and the attitude displayed by the Respondents the Claimants acted reasonably in delaying until 4th August before they concluded the Transammonia fixture. In the absence of argument I hold that the amount to be awarded is US\$421,031.90 plus interest at the annual rate of 5.50% compounded every three months from 1st September 2009 until payment. The rate and method of calculating interest are consistent with the practice in London maritime arbitration.

27. The general principle set out in section 61(2) of the Arbitration Act 1996 is that costs follow the event. I see no need to depart from that principle, even though the quantum of the claim was reduced during the course of the reference. The Respondents will therefore pay the Claimants' costs of the reference, such costs to be assessed by me – in default of agreement between the parties – in

accordance with section 63(5) of the Act. The Respondents will also pay my fees of the reference in the amount of £10,500.00.

28. This Award is final as to the matters which it decides but is interim in the reference. I reserve to myself jurisdiction to decide all other matters in the reference.

NOW I, DAVID FARRINGTON, having taken upon myself the burden of this reference and having carefully and conscientiously considered the evidence and submissions made to me, **DO MAKE AND PUBLISH THIS MY AWARD** as follows:

(A) **I HOLD AND FIND** that the claim succeeds in the amount of US$421,031.90.

(B) **I AWARD AND ADJUDGE** that the Respondents must immediately pay to the Claimants the sum of US$421,031.90 (Four Hundred Twenty One Thousand Thirty One United States Dollars and Ninety Cents) together with interest as provided in paragraph 26 above.

(C) **I FURTHER AWARD AND ADJUDGE** that the Respondents will pay the Claimants' recoverable costs in accordance with paragraph 27 above together with interest thereon at the annual rate of 5.50% compounded every three months from the date of this Award until the date of payment.

(D) **I FURTHER AWARD AND ADJUDGE** that the Respondents will pay my fees of the reference **PROVIDED ALWAYS** that if in the first instance the Claimants have paid all or any part of those fees then they shall be entitled to immediate reimbursement by the Respondents of the amount so paid together with interest at the annual rate of 5.50% compounded every three months from the date of payment by the Claimants to the date of reimbursement by the Respondents.

(E) **I RESERVE** to myself jurisdiction to decide all other matters in the reference.

GIVEN under my hand this 30th day of April 2012

_____                _____
David Farrington                                Witness

EXHIBIT C

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:


CARGO LEVANT SCHIFFAHRTSGESELLSCHAFT MBH

Claimants (Carrier)

and


PSL LIMITED

Respondents (Merchant)


m/v "Sunrise"


Liner Booking Note dated 26th June 2009


---------------------------

**COSTS AWARD**

---------------------------


1. By a Final Award ("the Award") dated 30th April 2012 I awarded and adjudged that the Respondents must immediately pay to the Claimants the amount of US$421,031.90 plus interest thereon at the rate and in the manner provided in the Award. I also awarded and adjudged that the Respondents should pay their own and the Claimants' costs of the reference, such costs to be assessed by me - in default of agreement - under section 63(5) of the Arbitration Act 1996 together with interest calculated at the annual rate of 5.50% compounded every three months from the date of the Award until the date of payment. I reserved to myself power to assess such costs.

2. On 30th August the Claimants through their solicitors, Bentleys Stokes & Lowless ("Bentleys"), made an Application that their recoverable costs and disbursements of the reference and related proceedings in the Commercial Court

be assessed in the sum of £97,852.52 including £3,522.50 for the costs of the assessment. They had on 30th July sent to Stephenson Harwood, whose London office had represented the Respondents throughout the reference, an itemised schedule which contained details (including hourly rates) of the costs and disbursements; there had been no response. On 8th September I, therefore, made an Order that the Respondents do by 1st October deliver their Points of Dispute. Nothing was heard from Stephenson Harwood; they had not given notice that their instructions on behalf of the Respondents had terminated. Accordingly, on 14th October I made a Final and Peremptory Order that the Respondents do by 23rd October deliver their Points of Dispute. The Respondents failed to comply with the Final and Peremptory Order; on 23rd November I informed the parties that I was proceeding to an award in accordance with the powers granted by section 41(7) of the Arbitration Act 1996.

3. However, on 27th November I asked Bentleys to provide further information and vouchers in connection with the claim for costs. The information and vouchers were provided on 6th December. They were also sent, under a Direction made by me, to Stephenson Harwood so that the Respondents could comment thereon. No submissions or comments have been made by the Respondents or on their behalf. All messages sent by me were by e-mail, being the normal means of communication for interlocutory matters in London maritime arbitration. None of the messages sent by me was returned as 'undelivered' by the electronic postal system.

4. I now turn to consider the amount claimed. Costs were awarded on the basis set out in paragraph 1 above. Section 63(5) of the Arbitration Act 1996 is the arbitral equivalent of the standard basis of assessment of costs. It provides:

"(5) Unless the tribunal or court determines otherwise

(a) the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and

*(b) any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party."*

Although the Civil Procedure Rules do not formally apply in arbitration, nevertheless the Rules provide useful guidance to an arbitral tribunal. CPR 44.4(2) provides:

*"(2) Where the amount of costs is to be assessed on the standard basis, the court will-*

*(a) only allow costs which are proportionate to the matters in issue; and*

*(b) resolve any doubt which it may have as to whether costs were reasonably incurred or reasonable and proportionate in favour of the paying party."*

The words "paying party" in this reference mean the Respondents. The factors which a court may take into account were set out in CPR 44.5. Section 63(5) does not specifically mention proportionality, but it is a factor to be taken into account when considering whether costs were reasonably incurred. I have also had regard to the figures and guidance provided by the "Guide to the Summary Assessment of Costs" published by the Supreme Court Costs Office. In addition I have used my professional experience in commercial arbitration both as a solicitor who formerly practised in the City of London and also as a Full Member of the LMAA. That experience has enabled me to gauge whether the approach of Bentleys was appropriate for the case and resulted, amongst other things, in a sensible level of staffing. I have also reviewed my own files.

5. I shall consider, first, the costs of the reference which included the hearing on 12th March 2012. I shall consider, second, the costs of the related court proceedings. As the Respondents have not provided any comments or submissions, I proceed on the footing that the entire amount of the costs and

disbursements are in issue. The burden is upon the Claimants to make out their entitlement.

6. The Claimants sought in respect of the reference £13,405.52 for disbursements, which included £1,600.00 of fees paid to me as Sole Arbitrator. The fees were the standard appointment and booking fees set by the LMAA. As to the balance of £11,805.52, I am satisfied that the fees of counsel (Mr Chris Smith) were properly incurred and were at a level commensurate with the relevant seniority. I, therefore, allow £8,500.00 for counsel. I also allow in full the travel and accommodation expenses of £1,117.46 for the visit of Mrs Steele and Ms Allen to Bremen. I am persuaded, after calling for an explanation, that it was appropriate in the circumstances for both the partner and the assistant solicitor to be involved for what transpired to be a day's work for each rather than, perhaps, a more protracted stay for one lawyer. I note with approval (and sympathy) that travel was by way of Ryanair or EasyJet which contributed to the low level of the travel expenses. I also allow the fees of the room hire for the hearing (£695.00) and the Transcript Writers (£800.00). However, the claim for telephone charges, copying and other incidentals (£693.06) was not vouched. To a certain extent telephone charges and copying are part of the overheads of a solicitor's office. However, bundles had to be prepared not only for the hearing but also to accompany earlier submissions. In the circumstances I allow £500.00 for the incidentals. The total, therefore, which I allow for disbursements is £13,212.46.

7. The sum of £72,123.50 was claimed for the fees of Bentleys for the work undertaken by them as the Claimants' solicitors. The schedule prepared on behalf of Bentleys by a costs draftsman identified the hourly rates claimed for particular fee-earners, that is to say Mrs Steele as the partner and Ms Allen as the assistant solicitor. Those hourly rates were appropriate and reasonable, given the nature of the work involved in the reference and the professional standing of the relevant fee-earner. They also compare favourably with rates charged by other firms which undertake maritime arbitration in London. I also approve the

staffing levels of one partner and an assistant solicitor. I note that the majority of the work was undertaken by Ms Allen, with Mrs Steele adopting the relevant supervisory role as a partner. The schedule did not give a breakdown of what work was undertaken and when, but in my opinion that does not matter because in an assessment such as this (which, for all practical purposes is comparable to a summary assessment) it is not really appropriate or necessary. The schedule provided sufficient information for me, and indeed the Respondents, to be able to have an informed view of the work done and for which fees were claimed.

8. Bearing in mind the essential issues in the reference, I consider that the majority of the time charged by Bentleys was proportionate and reasonable. However, I have a concern about the time spent on documents and perusals. This is always a difficult area for assessment, so I start from the fact that there were quite a lot of documents but that the volume and complexity of those documents were not that unusual for a claim of this type. A small adjustment is necessary because, if nothing else, there is inevitably a degree of duplication when documents are revisited as a reference progresses. Unfortunately, however, there was no detail of the work performed by the trainee solicitor and no explanation as to the contribution made by that work; the time is, therefore, disallowed. On considering the matter as a whole I have decided to allow as being recoverable total fees for the partner and assistant solicitor (including the fees for the trip to Bremen) in the amount of £68,500.00.

9. As to the costs of the court proceedings which led to my appointment, in principle they fall to be considered as part of the costs of the reference. I have not read or looked at Bentleys' file but based upon my experience (see paragraph 4 above) I have a reasonable knowledge of what is involved in such proceedings. Each set of proceedings, of course, has its own nuances but it could be said that to a certain extent such proceedings are not out of the ordinary in that occasions of unexpected twists and turns rarely occur. Bentleys have not indicated in the schedule that there were any such twists and turns.

10. The claim was for £8,771.00 including court fees of £440.00 I allow Mrs Steele's time in full. However, I have two concerns which relate to Ms Allen's time of (a) 5 hours 48 minutes for correspondence and attendance upon the Claimants, and (b) 21 hours 45 minutes claimed for documents and perusals, including the preparation of notices and a witness statement. The necessity of spending so much time in advising the Claimants is not apparent; they wished the claim against the Respondents to proceed so it must be assumed they were willing to go along with any reasonable measure (which the court proceedings clearly were) to achieve that end. Second, the nature of the application in my experience does not warrant extensive time on documents and perusals although, of course, I accept that a degree of time is inevitable. I have, therefore, allowed for (a) £960.00 and for (b) £4,800.00 respectively. I note in passing that it apparently took 6 minutes to diarise the date for an Acknowledgment of Service and 18 minutes to consider the form when it arrived. Of more importance, however, is that I have disallowed the time of the costs draftsman of £450.00 which seemed to me to be unnecessary in the circumstances. A quick look at the relevant time sheets was all that was required. Overall I assess the costs of the court proceedings at £7,238.00 to which must be added court fees of £440.00. The total awarded is, therefore, £7,678.00.

11. The Claimants have been successful in their Application leading to this Costs Award. The amount by which I have reduced the amount claimed is comparatively small. I therefore see no good reason to depart from the general principle stated in section 61(2) of the Arbitration Act 1996. The Respondents will pay the fees of the Claimants in procuring this Costs Award. I assess those fees in the amount claimed of £3,522.50. The Respondents will also pay my fees in the amount of £2,000.00.

NOW I, DAVID FARRINGTON, having taken upon myself the burden of this reference and having carefully and conscientiously considered the evidence and submissions made to me, DO MAKE AND PUBLISH THIS MY COSTS AWARD as follows:

(A) **I ASSESS** the Claimants' recoverable costs in the amount of US$92,912.96.

(B) **I AWARD AND ADJUDGE** that the Respondents must immediately pay to the Claimants

> (i) the amount of £89,390.46 (Eighty Nine Thousand Three Hundred Ninety Pounds Sterling and Forty Six Pence) together with interest at the rate and calculated in the manner provided by the Award, and

> (ii) the amount of £3,522.50 (Three Thousand Five Hundred Twenty Two Pounds Sterling and Fifty Pence) together with interest thereon at the annual rate of 5.50% compounded every three months from the date of this Costs Award until payment.

(C) **I FURTHER AWARD AND ADJUDGE** that the Respondents will pay my fees of this Costs Award in the amount of £2,000.00 **PROVIDED ALWAYS** that if in the first instance the Claimants have paid all or any part of those fees then they shall be entitled to immediate reimbursement by the Respondents of the amount so paid together with interest at the annual rate of 5.50% compounded every three months from the date of payment by the Claimants to the date of reimbursement by the Respondents.

GIVEN under my hand this 21ˢᵗ day of December 2012

David Farrington

Witness



# DAVID FARRINGTON

Chorley Farm House, West Wycombe, Buckinghamshire HP14 4BS
Tel: 44 (0) 1494 558285 E-mail: df@chorleyfarm.co.uk

RECEIVED
28 JAN 201

Friday, 25 January 2013

Bentleys Stokes & Lowless
International House
1 St Katherine's Way
London E1W 1YL

Ref: Ms. Sarah Allen

Stephenson Harwood
1 Finsbury Circus
London EC2M 7SH

Ref: Rovine Chandrasekera

Dear Sirs,

**"Sunrise"; bn dd 26.06.09**

There has been no response from Stephenson Harwood to my message of 16th January. I, therefore, enclose Correction to Costs Award pursuant to section 57 of the Arbitration Act 1996.

Yours faithfully,

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:


CARGO LEVANT SCHIFFAHRTSGESELLSCHAFT MBH

Claimants (Carrier)

and

PSL LIMITED

Respondents (Merchant)


m/v "Sunrise"


Liner Booking Note dated 26th June 2009


## CORRECTION TO COSTS AWARD PURSUANT TO SECTION 57 OF THE ARBITRATION ACT 1996


WHEREAS

1. On 21st December 2012 I, the undersigned Arbitrator, made a Costs Award in this reference.

2. In paragraph (A) of the operative part of the Costs Award I stated that I had assessed the Claimants' recoverable costs in the amount of US$92,912.96. I am satisfied that is a typographical error because, as is apparent from the Costs Award, the claim made in respect of the costs and disbursements of Bentleys Stokes & Lowless was in £ sterling.

3. I have jurisdiction under section 57(3) of the Arbitration Act 1996 of my own initiative to correct an award so as to remove any clerical mistake or error arising

from an accidental slip. I have given notice to both parties of my intention to make a correction to the Costs Award but, unfortunately, the Respondents have not replied to that notice. **NOW I HEREBY CORRECT** the Costs Award as follows in order that it reflects my true intention by deleting from paragraph (A) the words "US$92,912.96" and replacing them with the words "£92,912.96".

4. I confirm that the Costs Award should be treated as having been amended accordingly and that this amendment forms part of it. In all other respects the Costs award remains unchanged.

GIVEN under my hand this 25th day of January 2013

David Farrington                      Witness



# DAVID FARRINGTON

Chorley Farm House, West Wycombe, Buckinghamshire HP14 4BS
Tel: 44 (0) 1494 558285 **Fax:** 44 (0) 1494 510957 **E-mail:** df@chorleyfarm.co.uk

Tuesday, 22 May 2012

Bentleys Stokes & Lowless
International House
1 St Katherine's Way
London E1W 1YL

Ref: JMS/SLA/S00286.3



Stephenson Harwood
1 Finsbury Circus
London EC2M 7SH

Ref: 979/49-02013

Dear Sirs,

### "Sunrise": bn dd 26.06.09

The Claimants have paid their portion of the fees on the Final Award: the Respondents have paid £4,200 and Stephenson Harwood have given their personal undertaking in respect of the balance of £1,050.  Thank you both very much.

Enclosed is the Award made 30th April 2012.

Yours faithfully,

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

CARGO-LEVANT
SCHIFFAHRTSGESELLSCHAFT MBH

        Plaintiff

    v.

PSL LIMITED

        Defendant

and

PSL NORTH AMERICA, LLC

        Garnishee

Civil Action No.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR MARITIME ATTACHMENT AND GARNISHMENT PURSUANT TO ADMIRLATY RULE B(1)(B)

KEVIN G. O'DONOVAN, being duly sworn, deposes and says:

1.    I am a partner in the firm of Palmer Biezup & Henderson, LLP, attorneys for Plaintiff, Cargo-Levant Schiffahrtsgesellschaft MbH").

2.    I make this affidavit in support of Plaintiff's application for the issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B(1)(b) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

3.    Based upon the results of the inquiries detailed below, to the best of my information and belief Defendant PSL Limited is a foreign corporation and cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

1

4.    An examination of telephone directories available electronically and a call to directory assistance revealed no telephone listing for the Defendant in the State of Georgia.

5.    I caused a search to be made of the Georgia Department of State Division of Corporations computer database and the Defendant is neither listed as a Georgia business entity, nor as a foreign business entity qualified to do business in Georgia.

6.    Other sources, including the Westlaw Company Index, likewise show no listing for the Defendant within the State of Georgia.

7.    The results of an internet search indicated that the Defendant is an entity organized and existing under the laws of the Country of India with a principle office located at PSL Towers, 615, Makwana Road, Marol, Andheri, Mumbai, India, 400-059.

8.    I respectfully submit that Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, thereby satisfying the requirements for issuance of Writs of Maritime Attachment and Garnishment under the Rule.

9.    To the best of the deponent's information and belief, no previous application for an Order of Attachment or similar relief has been sought against the Defendant in this District.

Executed this _3rd_ day of July, 2013

_____
Kevin G. O'Donovan

Sworn to and subscribed to
before me this _9th_ day of
July, 2013.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Charles P. Neely, Notary Public
New Britain Twp., Bucks County
My Commission Expires April 22, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

PBH405480.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

CARGO-LEVANT
SCHIFFAHRTSFESELLSCHAFT MBH         :
                                    :
              Plaintiff             :
                                    :
        vs.                         :      Civil Action No.
                                    :
PSL LIMITED                         :
                                    :
              Defendant             :
                                    :
        and                         :
                                    :
PSL NORTH AMERICA, LLC              :
                                    :
              Garnishee             :

## VERIFICATION

Kevin G. O'Donovan, being duly sworn according to law, deposes and says:

1.      I am a partner in the law firm Palmer Biezup and Henderson, LLP, counsel to the Plaintiff, Cargo-Levant Schiffahrtsgesellschaft MbH.

2.      Plaintiff is a business entity organized and existing under the laws of a foreign country, none of the officers of which are now within this District and I am authorized to make this Verification on their behalf.

3.      The facts alleged in the foregoing complaint are true and correct to the best of my knowledge, information and belief.

7

4.      The sources of your deponent's information are documents and information furnished to me by the Plaintiff and discussions with the Plaintiff's solicitors in London, England.

I hereby certify that I have read the foregoing statements and that they are true and correct.

_____
Kevin G. O'Donovan

SUBCRIBED TO AND SWORN TO before me

this ___ day of July 2013.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Charles P. Neely, Notary Public
New Britain Twp., Bucks County
My Commission Expires April 22, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

8